## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALACHUA GOVERNMENT SERVICES, INC., | ) Case No. 25-11289 (JKS) |
| | ) |
| Debtor.[1] | ) Proposed Obj. Deadline: Dec. 2, 2025 at 4:00 p.m. (ET) |
| | ) Hearing Date: To Be Determined |
| | ) |

**MOTION OF THE DEBTOR FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ROYALTY ASSETS, (B) AUTHORIZING THE DEBTOR TO DESIGNATE A STALKING HORSE BIDDER AND TO PROVIDE BIDDING PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTOR'S ROYALTY ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The debtor in possession in the above-captioned case (the "**Debtor**") hereby moves (this "**Motion**") and respectfully states as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final

---

[1]     The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number is: Alachua Government Services, Inc. (5370).  The Debtor's mailing address is 13200 NW Nano Court, Alachua, Florida 32615.

order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

2.      Venue of this Chapter 11 Case (as defined below) and the Motion are proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## **RELIEF REQUESTED**

3.      By this Motion, the Debtor seeks entry of (a) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "**Bidding Procedures**"), to be used in connection with the sale (the "**Sale Transaction**") of the Debtor's ownership of certain Vero cell lines and related intellectual property used in the development of a smallpox vaccine by a third party (the "**Royalty Assets**"), (ii) authorizing the Debtor to designate a Stalking Horse Bidder (as defined below) and provide Bid Protections (as defined below) in accordance with the Stalking Horse Designation Procedures (as defined below), (iii) scheduling an auction of the Royalty Assets (the "**Auction**"), if any, and scheduling the hearing to approve a sale of the Royalty Assets (the "**Sale Hearing**"), (iv) approving the form and manner of notice of the proposed Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**"), (v) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "**Contracts**") in connection with any Sale Transaction (the "**Assumption and Assignment Procedures**"), (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "**Counterparty**") of (A) the Debtor's calculation of the amount necessary to cure any defaults under an applicable Contract (the "**Cure Costs**") and (B) certain other information regarding the potential assumption and assignment of

2

Contracts in connection with the Sale Transaction, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Assumption and Assignment Notice**"), and (vii) granting related relief; and (b) an order (the "**Sale Order**")[2] (i) authorizing the sale of the Royalty Assets free and clear of all liens, claims, interests, and encumbrances, except certain assumed liabilities and permitted encumbrances as determined by the Debtor and the bidder providing the highest or otherwise best bid for the Royalty Assets (the "**Successful Bidder**" and such bid, the "**Successful Bid**"), with liens to attach to the proceeds of the Sale Transaction, (ii) authorizing the assumption and assignment of certain Contracts in connection with the Sale Transaction, and (iii) granting related relief.  In support of this Motion, the Debtor relies on and incorporates the *Declaration of Michael O'Hara of Jefferies LLC in Support of the Debtor's Bidding Procedures and Sale Motion* (the "**O'Hara Declaration**"), filed contemporaneously herewith, and respectfully represents as follows:

### BACKGROUND

#### I.    General

4.    On July 6, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court commencing a case (the "**Chapter 11 Case**") for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to manage its property and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Case.

5.    On July 23, 2025, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "**Committee**").  *See* Docket No. 64.

---

[2]    A copy of the Sale Order will be filed in advance of the Sale Hearing.

6.    The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the *Declaration of Janet R. Naifeh, Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day and Other Pleadings* [Docket No. 16] (the "**First Day Declaration**"), which is fully incorporated herein by reference.

## II.    The Royalty Assets

7.    The Debtor's Royalty Assets include the royalty revenue derived from certain Vero cell lines owned by the Debtor and used in the development of a smallpox vaccine pursuant to a license agreement (the "**License Agreement**") with Emergent Biosolutions, Inc. ("**Emergent**"). Vero cells consist of a continuous cell line derived from kidney epithelial cells extracted from the African green monkey.   These cells are a primary cell line approved by the World Health Organization for use in vaccine production.  Vero cells cannot express antiviral protein interferon used to fight infection and disease due to their inherent genetic defects, therefore making them ideal for the development of vaccine production.  As noted above, the Debtor entered into a royalty arrangement with Emergent whereby the Debtor's Vero cell lines are utilized in the production of Emergent's ACAM2000® active vaccine used in the prevention of the smallpox disease for high-risk individuals.  Under the terms of the License Agreement, the Debtor receives a quarterly royalty payment from Emergent which is calculated based on a percentage of the net average selling price in any given quarter of the product sold by Emergent subject to certain adjustments.  Pursuant to the proposed Bidding Procedures, the Debtor is seeking to sell the Royalty Assets, which consist of, among other things, the royalty stream under the License Agreement, the Vero cells used in connection with the License Agreement and the intellectual property used in connection with the Vero cell assets.

4

### III.    Prepetition and Postpetition Marketing Process

8.     As a result of the economic pressures facing the Debtor, in February 2025, Jefferies LLC and Jefferies International Limited (collectively, "**Jefferies**") were engaged to, among other things, pursue a potential sale or other strategic transactions involving the Debtor's business and assets, including sales of the Debtor's operating business and real and personal property assets in Alachua, Florida.  Despite targeted outreach to no fewer than seventy-five (75) parties, the Debtor was unable to consummate a going concern sale prior to the Petition Date.

9.     As a result of the prepetition marketing process failing to result in any going concern bids, in June 2025, the Debtor, with the assistance of Jefferies, began seeking alternative sale proposals from interested parties for the Debtor's assets, including the Debtor's real and personal property assets in Alachua, Florida (the "**Alachua Site Assets**") and the Royalty Assets. On October 30, 2025, the Debtor closed a sale of its Alachua Site Assets (the "**Alachua Site Sale**").

10.     With respect to the Royalty Assets, immediately following the Petition Date, on July 10, 2025, Jefferies began outreach to potential financial and strategic buyers. Since then, forty-five (45) parties have been contacted regarding the opportunity to acquire the Royalty Assets and twenty-two (22) parties executed non-disclosure agreements (each an "**NDA**"). In addition, Jefferies also opened a virtual data room containing diligence materials related to the Debtor's assets for all potential bidders under an NDA.

11.     During the course of the marketing process, Jefferies requested that parties interested in serving as a stalking horse bidder for the Royalty Assets provide the Debtor with indications of interest (each an "**IOI**") outlining the terms of such agreement.  The Debtor received two (2) IOIs from potential interested purchasers, of which one has since expired.  Following the receipt of the IOIs, in an effort to maximize value, the Debtor and its advisors pursued discussions

5

with its former parent entities and the Committee regarding purchasing the Royalty Assets in connection with resolving other issues in the case. However, to date, those discussions have not materialized in an agreement between the parties and, due to a number of factors, including the December 31, 2025 maturity date (the "**DIP Maturity Date**") of the Debtor's DIP Financing (as defined below), the Debtor has determined that it is in the best interest of its estate and its stakeholders to proceed with the sale of the Royalty Assets.

12.     Once the Debtor determined to proceed with the sale of the Royalty Assets, Jefferies immediately contacted interested parties, including those that submitted IOIs, to determine whether any party remained interested in serving as a Stalking Horse Bidder. The Debtor hopes that it will be in the position to designate a Stalking Horse Bidder prior to the Bid Deadline (as defined below) but determined to file this Motion without such designation so that the sale can occur prior to the Target Closing Date (as defined below).

## THE NEED FOR A TIMELY PROCESS

13.     The Debtor commenced this case to wind down its operations and sell its assets for the benefit of its stakeholders. Shortly after the Petition Date, the Debtor obtained Court approval to obtain postpetition financing (the "**DIP Financing**") to fund the Chapter 11 Case. The DIP Maturity Date under the DIP Financing is December 31, 2025. Absent a sale of the Royalty Assets, the Debtor's most recent DIP forecast projects that it will not have sufficient cash to pay the amounts outstanding under the DIP Financing on the DIP Maturity Date. Even if the Debtor's cash performance is favorable to budget and sufficient cash does exist to repay the amounts outstanding under the DIP Financing on the DIP Maturity Date, such payment would leave insufficient remaining cash for the Debtor to fund the Chapter 11 Case going forward. Accordingly, unless an extension of the DIP Maturity Date is granted by the DIP Lender, the Debtor risks either a default under its DIP Financing or having insufficient funds to operate its

Chapter 11 Case if a sale is not consummated by the DIP Maturity Date.  In order for the DIP Lender to grant a short extension of the DIP Maturity Date, it is critical to have the proposed dates approved and communicated to prospective bidders as soon as possible, so that the Debtor and the Consultation Parties can receive and evaluate the bids for the Royalty Assets prior to the holidays and the DIP Maturity Date. Additionally, even with an extension of the DIP Maturity Date, the Debtor expects that remaining liquidity to fund the Chapter 11 Case may be extremely limited by mid-January. As a result, the Debtor seeks to conduct the sale process (the "**Sale Process**") to allow the sale to close by January 15, 2026 (the "**Target Closing Date**").

14.    In addition, the Debtor, with the assistance of Jefferies, has been extensively marketing the Royalty Assets for almost five (5) months to a wide range of potential strategic and financial investors and buyers, and a substantial amount of information regarding the Debtor's business and the Royalty Assets has been made available to these prospective purchasers during the Sale Process.  The Debtor and its advisors have proposed a timeline that balances the need to provide adequate notice to parties in interest, and to sufficiently market the Royalty Assets in the context of a postpetition Sale Process with the need to quickly and efficiently consummate a Sale Transaction prior to the Target Closing Date.  The Bidding Procedures and the Debtor's proposed timeline for the Sale Process reflect the best option for maximizing the value of the Royalty Assets under the circumstances of this Chapter 11 Case.  The Debtor believes that prospective bidders already know the Royalty Assets well and will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

15.    Finally, the Debtor believes that the Bidding Procedures will provide a uniform process by which interested bidders can participate in a competitive auction for the Royalty Assets.

RLF1 34196803v.6

The Debtor believes that the Bidding Procedures will market test the Royalty Assets and will lead to a value-maximizing transaction.

16.    Accordingly, given the time constraints and the extensive marketing of the Royalty Assets, the Debtor has determined that pursuing the sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interests of the Debtor's estate, will provide interested parties with sufficient opportunity to participate, and will maximize the value of the Royalty Assets for the benefit of its stakeholders.

## IV.    The Bidding Procedures

### A.    Overview

#### 1.    Stalking Horse Designation Procedures

17.    As part of its Bidding Procedures, the Debtor seeks authority, subject to the terms of the Bidding Procedures Order, to designate one or more stalking horse bid(s) (the "**Stalking Horse Bids**"), pursuant to the procedures set forth in the Bidding Procedures (the "**Stalking Horse Designation Procedures**") for the Royalty Assets and to enter into one or more purchase agreements (the "**Stalking Horse Agreements**") with one or more potential bidder (the "**Stalking Horse Bidders**"), upon consultation with the (i) legal and financial advisors for DIP Lender, and (ii) the Committee, through its legal and financial advisors (together, the "**Consultation Parties**").

18.    The Debtor believes it is important to have the ability to enter into a Stalking Horse Agreement with a potential buyer and foresees that it may be necessary to afford a Stalking Horse Bidder certain protections (the "**Bid Protections**").  Accordingly, the Debtor requests authority, subject to the terms of the Bidding Procedures Order, to seek entry of an order approving the designation of a Stalking Horse Bidder and, to the extent applicable, any proposed Bid Protections (a "**Stalking Horse Order**") by (i) filing a notice (the "**Stalking Horse Hearing Notice**") setting an expedited hearing on not less than five calendar days' notice and (ii) requiring parties wishing

8

to object to entry of the Stalking Horse Order to file any such objections within three calendar days after service of the Stalking Horse Notice (the "**Stalking Horse Objection Deadline**"). The Debtor proposes that the Stalking Horse Hearing Notice will (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly-formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Stalking Horse Bid and what portion (if any) is cash; (iii) identifies any connections the Stalking Horse Bidder has to the Debtor other than those connections that arise from the Stalking Horse Bid; (iv) specifies any proposed Bid Protections; (v) attaches the Stalking Horse Agreement; (vi) attaches the proposed form of Stalking Horse Order; and (vii) and sets forth the Stalking Horse Order Objection Deadline.

19.    The Debtor also proposes that to the extent the Debtor seeks to provide Bid Protections to a Stalking Horse Bidder that is either (A) an "insider" as that term is defined in section 101(31) of the Bankruptcy Code or (B) a credit bid by the DIP Lender or the Prepetition Secured Lender, then the Debtor will file a separate motion seeking approval of such Bid Protections and may request that the Court hold a hearing on the approval of such motion on an expedited basis.

20.    The Debtor intends to provide copies of any Stalking Horse Agreements, if applicable, and, in its discretion, may provide form purchase agreements if no Stalking Horse Agreement has been entered into with respect to the Debtor's Royalty Assets, to all parties who designate their interest in submitting a bid.

### 2.    Bidding Procedures Summary

21.    The Debtor, in consultation with its advisors, designed the Bidding Procedures to promote a competitive and expedient Sale Process.  If approved, the Bidding Procedures will allow the Debtor to solicit and identify bids from potential buyers that constitute the highest or otherwise

best offer for the Royalty Assets on a schedule consistent with the Debtor's chapter 11 strategy and liquidity position.

22.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  Pursuant to Local Rule 6004, certain of the key terms of the Bidding Procedures are highlighted in the chart below:[3]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **Qualified Bid and Qualified Bidder Requirements are set forth in the Bidding Procedures.**<br><br>**A.   Due Diligence** – Execute confidentiality agreement with the Debtor.<br><br>**B.   Bid Deadline** – Submit Qualified Bid by **December 19, 2025, at 4:00 p.m. (ET)**.<br><br>**C.   Qualified Bid Requirements**<br><br>• Irrevocability of Bid. The Bid must include a letter stating that the Prospective Bidder's offer is irrevocable and binding until the closing of the Sale if such Prospective Bidder is the Successful Bidder, and that the Prospective Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined below).<br><br>• Royalty Assets and Liabilities. The Bid must clearly identify the following: (a) the Royalty Assets to be purchased and (b) the liabilities and obligations to be assumed, including any indebtedness to be assumed, if any.<br><br>• Designation of Assigned Contracts and Leases. The Bid must identify any and all executory contracts and unexpired leases of the Debtor that the bidder wishes to be assumed and assigned to the bidder at closing. The Bid must confirm that the bidder will be responsible for any Cure Costs associated with such assumption and include a good faith estimate of such Cure Costs (which estimate may be provided by the Debtor).<br><br>• Purchase Price. The Bid must clearly set forth the cash purchase price, and any other non-cash consideration (with the form of such consideration specified), to be paid.<br><br>• Minimum Bid. Each Bid must either (a) (i) provide for the payment of aggregate consideration, in the Debtor's good-faith business judgment, the value of which |

---

[3]    This summary is qualified in its entirety by the provisions of the Bidding Procedures.  To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control.  Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Bidding Procedures, as applicable.

is in excess of at least the sum of (x) the purchase price under any Stalking Horse Agreement plus (y) any Bid Protections approved by the Court and clear the minimum Overbid (as defined below) amount which shall be made in increments of at least $1,000,000 in cash, cash equivalents, or such other consideration that the Debtor deems equivalent (in consultation with the Consultation Parties); or (b) propose an alternative transaction that, after consultation with the Consultation Parties, in the Debtor's good faith business judgment, provides higher value or better terms than a Stalking Horse Bid. The Debtor and its advisors may determine appropriate minimum Bid increments for each round of bidding. Notwithstanding anything to the contrary herein, this requirement cannot be amended or modified without the consent of the DIP Lender.

- Deposit. Each Bid (except a DIP Credit Bid) must be accompanied by a good faith deposit in the form of cash in an amount equal to not less than ten percent (10%) of the aggregate purchase price of the Bid to be held in an escrow account to be identified and established by the Debtor (the "**Deposit**"). For the avoidance of doubt, to the extent the Purchase Price of a Bid is increased, at any time or from time to time, whether prior to commencement of the Auction (if any) or during the Auction (if any), the amount of the Deposit shall automatically increase accordingly (i.e., to become equal to ten percent (10%) of any increased Purchased Price) and the corresponding bidder will promptly pay into escrow the amount of such increase, within one (1) business day, following such increase. Without limiting the foregoing, if a Purchase Price is increased in order to make a bid into a Qualified Bid, the Debtor may condition participation of the applicable bidder at the Auction (if any) on such bidder paying the then full amount of the Deposit into escrow prior to the commencement of such Auction or such participation.

- Asset Purchase Agreement. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"). The Bid Documents shall include a copy of the asset purchase agreement, including a complete set of all disclosure schedules and exhibits thereto, and marked against either the form asset purchase agreement to be provided by the Debtor to prospective bidders (the "**Form APA**") or, if applicable, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse Agreement, as applicable, as well as all other material documents integral to such Bid.

- Adequate Assurance Information. The Bid must include sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assigned to the Qualified Bidder (as defined below) in connection with the proposed Sale which shall include (i) audited and unaudited financial statements, (ii) tax returns, (iii) bank account statements, (iv) a description of the manner in which the Bidder plans to capitalize and manage the business going forward, and (v) any such other documentation or information as the Debtor may request (the foregoing clauses (i)-(v) and/or such other documentation and information satisfactory to the Debtor to demonstrate an Prospective Bidder's adequate assurance of future performance, collectively, the "**Adequate Assurance Package**"). The Bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information. The Adequate Assurance Package must be submitted to the Debtor and its advisors at the time of the Bid's submission in its own compiled pdf document. Any requests made

11

by the Debtor or its advisors thereafter for further or supplemental information or documentation must be promptly provided to the Debtor and its advisors.

- Proof of Financial Ability to Perform. Each Bid must include written evidence that the Debtor reasonably concludes that the bidder has the necessary financial ability to timely close the proposed Sale Transaction in accordance with the Bidding Procedures. Such information must include (i) contact names, telephone numbers, and email addresses for verification of financing sources; (ii) evidence of the bidder's internal financing resources and, if applicable, proof of fully executed and effective financing commitments with limited conditionality customary for transactions of the proposed Sale Transaction's type from one or more reputable financing sources in an aggregate amount equal to the Cash portion of such Bid (including, if applicable, the payment of Cure Costs), in each case, as are required to timely close the Sale Transaction; and (iii) any other financial disclosure or credit-quality support information or enhancement requested by the Debtor demonstrating that such bidder has the ability to timely close the proposed Sale Transaction in accordance with the Bidding Procedures.

- Contingencies; No Financing or Diligence Outs. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

- Identity. The Bid must fully disclose the identity of the party submitting the Bid (and any equity holders, limited partners, or other financial backer), its full legal name, jurisdiction of incorporation or formation, and location in the Prospective Bidder's corporate structure and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale.

- As-Is, Where-Is. The Bid must include the following representations and warranties: (a) a statement expressly confirming that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Royalty Assets prior to submitting its Bid, (b) a statement that the Prospective Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Royalty Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, by the Debtor, Jefferies, or the Debtor's advisors regarding the Debtor's business or the Royalty Assets or the completeness of any information provided in connection therewith, except, solely with respect to the Debtor, as expressly stated in the representations and warranties contained in the Prospective Bidder's proposed asset purchase agreement ultimately accepted and executed by the Debtor; and (c) the Prospective Bidder's agreement to not use information obtained from the Data Room or the diligence process in connection with, or related to, any litigation or other legal actions between such Prospective Bidder (including its affiliates and any related persons) and the Debtor, any current or former directors and officers of the Debtor, the Debtor's affiliates, and/or the Debtor's primary creditors as identified by the Debtor.

- Authorization. The Bid must include evidence that the Prospective Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtor with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory,

antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Prospective Bidder.

- Disclaimer of Fees. Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than a Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under §503(b) of the Bankruptcy Code.

- Time Frame for Closing. A Bid by a Prospective Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtor's business judgment) to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Debtor (in consultation with the Consultation Parties) and, in any event, by the Sale Consummation Deadline. The Prospective Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Prospective Bidder's acquisition of the Royalty Assets including timing for resolution thereof.

- Adherence to Bidding Procedures. Each Bid must include (a) a statement that the Prospective Bidder has acted in good faith consistent with §363(m) of the Bankruptcy Code and (b) a statement that the Prospective Bidder agrees to be bound by, and has complied with, the Bidding Procedures.

- Joint Bids. The Debtor is authorized to approve joint bids, in the exercise of its business judgment and in consultation with the Consultation Parties, on a case-by-case basis; provided that the foregoing is subject to the restrictions on communications among bidders set forth herein, and that the Debtor authorizes any joint bids in writing (email being sufficient).

- No Collusion. The Prospective Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to §363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Prospective Bidders or Qualified Bidders to control price and (b) it agrees not to engage in any collusion that would be subject to §363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

- Other Information. The Bid contains such other information as may be reasonably requested by the Debtor.

| | |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).  *See* Bidding Procedures Order ¶ 36. |
| **Provisions Providing Bid Protections to** | Other than any Bid Protection approved by the Court pursuant to paragraph 6 of the Bidding Procedures Order in connection with a Stalking Horse Bid, if any, no bidder or any other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any |

| | |
|---|---|
| **Stalking Horse or Initial Bidder** Local Rule 6004-1(c)(i)(C) | other bidding protection in connection with the submission of a bid for the Royalty Assets or otherwise participating in the Auction or the Sale Process. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | The Debtor reserves the right to, in its reasonable business judgment (in consultation with the Consultation Parties), modify the Bidding Procedures in good faith, including, without limitation, the Sale Consummation Deadline and any other milestones thereunder, to further the goal of attaining the highest or otherwise best offer for the Royalty Assets, or impose, at or prior to selection of the Successful Bidder, additional customary terms and conditions on the Sale of the Royalty Assets, including, without limitation (a) extending the deadlines set forth in the Bidding Procedures, (b) adjourning the Auction (if held) without further notice, (c) adding or modifying procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction and/or adjourning the Sale Hearing in open court (if held), (d) canceling the Auction or electing not to hold an Auction, (e) rejecting any or all Bids or Qualified Bids, (f) adjusting the applicable Minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind basis," and (g) other than with respect to a Stalking Horse Agreement, selecting a draft purchase agreement agreed to by a Qualified Bidder in connection with a Qualified Bid to serve as the purchase agreement that will be executed by the Successful Bidder or Successful Bidders, as applicable, and with any necessary adjustments for the assets and liabilities being purchased and assumed, upon conclusion of the Auction, if held. The Debtor shall provide reasonable notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidder. |
| **Closing with Alternative Back-up Bidders** Local Rule 6004-1(c)(i)(E) | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Royalty Assets, as determined by the Debtor in the exercise of its reasonable business judgment (in consultation with the Consultation Parties) (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and such Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.

The Backup Bid shall remain binding on the Backup Bidder until the closing of a Sale Transaction for the applicable Royal Assets pursuant to the Successful Bid. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If one or more Qualified Bids is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Royalty Assets. If the Debtor does not receive any Qualified Bids (other than a Stalking Horse Bid), the Debtor will not conduct an Auction and will designate such Stalking Horse Agreement as the Successful Bid.

Prior to the commencement of the Auction, the Debtor will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtor's reasonable business judgment (in consultation with the Consultation Parties) (the "**Baseline Bid**"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtor (in consultation with the Consultation Parties) reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to be assumed; (ii) the executory contracts and unexpired leases of the Debtor, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the |

14

number, type, and nature of any changes to any Stalking Horse Agreement, if any and as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Royalty Assets and the cost to the Debtor of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtor's estate; and (vii) the tax consequences of such Qualified Bid.

The Auction shall take place on **January 5, 2026 at 10:00 a.m. (prevailing Eastern time)**, at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, or such later date, time and location as designated by the Debtor (in consultation with the Consultation Parties), after providing notice to the following parties: (i) the DIP Lender, JMB Capital Partners Lending, LLC, and its counsel, (ii) the United States Trustee for the District of Delaware, (iii) the Prepetition Secured Lender, and (iv) counsel to the Committee. In the event that the Auction cannot be held at a physical location, the Auction will be conducted via a virtual meeting (either telephonic or via videoconference) the information to join which virtual meeting shall be provided by the Debtor to each Qualified Bidder prior to the Auction.

The Auction shall be governed by the following procedures, subject to the Debtor's right to modify such procedures in its reasonable business judgment (in consultation with the Consultation Parties):

- Baseline Bids. Bidding shall commence at the amount of the Baseline Bid.

- Minimum Overbid. Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Royalty Assets (each such Bid, an "**Overbid**"). Any Qualified Bidder's initial Overbid shall be made in increments of at least $1,000,000 in cash, cash equivalents, or such other consideration that the Debtor deems equivalent (in consultation with the Consultation Parties). The Debtor may, in its reasonable business judgment (in consultation with the Consultation Parties), announce increases or reductions to initial or subsequent Overbids at any time during the Auction.

- Highest or Best Offer. After the first round of bidding and between each subsequent round of bidding, the Debtor (in consultation with the Consultation Parties) shall announce the Bid that they believe in its reasonable business judgment to be the highest or otherwise best offer for the relevant Royalty Assets (the "**Leading Bid**") and describe the material terms thereof, after taking into effect payment of the Break-Up Fee. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid. To the extent not previously provided (which is determined by the Debtor), a Qualified Bidder submitting a subsequent Bid must submit, as part of its subsequent Bid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor, in consultation with the Consultation Parties, which availability is not otherwise conditioned on obtaining financing or any internal approval other than customary conditions in financing commitments) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such subsequent Bid.

- Rejection of Bids. The Debtor may, in its reasonable business judgment (in consultation with the Consultation Parties), reject, at any time before entry of an order of the Court approving a Qualified Bid, any Bid that the Debtor determines

is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtor, its estate, its creditors, and other stakeholders.

- No Round-Skipping. Round-skipping, as described in the Bidding Procedures, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor in its reasonable business judgment (in consultation with the Consultation Parties), such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Purchased Assets; provided that, with the consent of the Consultation Parties, the Debtor may adopt and utilize the Auction procedures other than the foregoing procedure for any round of bidding.

- Additional Information. The Debtor (in consultation with the Consultation Parties) shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by its proposal and any further information that the Debtor believes is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

- Modification of Procedures. The Debtor may announce at the Auction modified or additional procedures for conducting the Auction, or otherwise modify the Bidding Procedures, in each case in consultation with the Consultation Parties; provided that at no point may the form of currency be in a form other than cash. All such modifications and additional rules will be communicated in advance to each of the Consultation Parties and Qualified Bidders; provided that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.

The Auction shall include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional Bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their Bids; provided that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid) must remain open and binding on the Qualified Bidder until the close of the Auction, and, if selected as either a Successful Bid or a Backup Bid, until the closing of the Sale Transaction contemplated by such Successful Bid or Backup Bid. The Debtor may, in its reasonable business judgment (in consultation with the Consultation Parties), negotiate with any and all Qualified Bidders participating in the Auction.

B.    **Key Dates and Deadlines**

23.    The Debtor proposes the following key dates and deadlines for the Sale Process,

certain of which dates and deadlines may be subject to extension in accordance with the Bidding

Procedures.[4]

| PROPOSED DATE | EVENT |
|---|---|
| December 8, 2025 | Deadline for Debtor to file and serve Sale Notice |
| December 8, 2025 | Deadline for Debtor to file and serve Assumption and Assignment Notice |
| December 10, 2025 | Stalking Horse Designation Deadline |
| December 15, 2025 | Stalking Horse Objection Deadline |
| December 19, 2025, at 4:00 p.m. (ET) | Bid Deadline |
| December 30, 2025, at 4:00 p.m. (ET) | Sale Objection Deadline and Cure Objection Deadline |
| January 5, 2026, at 10:00 a.m. (ET), at the Offices of Richards, Layton & Finger, P.A., Wilmington, Delaware | Auction |
| January 6, 2026 | Deadline for Debtor to file and serve Notice of Successful Bidder |
| January 6, 2026 at 4:00 p.m. (ET) | Debtor's Deadline to Reply to Objections |
| At the Sale Hearing | Post-Auction Objection Deadline and Adequate Assurance Objection Deadline |
| January 8, 2026, subject to the availability of the Court | Sale Hearing |
| January 15, 2026 | Deadline to consummate approved sale transaction |

---

[4] The Debtor reserves the right to change the proposed sale-related deadlines in accordance with the Bidding Procedures at any time prior to the Bidding Procedures Hearing; *provided, however*, that any modified dates shall not provide parties with any lesser notice or time than the dates set forth in the entered Bidding Procedures Order.

RLF1 34196803v.6

### C.    Sale Noticing and Objection Procedures

24.    The below chart sets forth the noticing and objection procedures and requirements in connection with the Bidding Procedures and approval of a Sale Transaction (collectively, the "**Sale Noticing and Objection Procedures**"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | No later than December 8, 2025, the Debtor will file with the Court, serve on the Sale Notice Parties and cause to be published on the Debtor's case website (the "**Case Website**") hosted by Epiq Corporate Restructuring, LLC, the Sale Notice, which will set forth (A) a description of the Royalty Assets available for sale in accordance with the Bidding Procedures; (B) the date, time and location of the Auction and Sale Hearing; (C) the Sale Objection Deadline and Post-Auction Sale Objection Deadline (each as defined below) and the procedures for filing such objections and, if applicable, (D) a summary of the material terms of any Stalking Horse Agreement, including the terms and conditions of the Bid Protections to be provided thereunder.<br><br>For purposes of service of the Sale Notice, the following parties shall collectively be referred to as the "**Sale Notice Parties**":<br><br>• The Consultation Parties (the DIP Lender and the Committee);<br><br>• Counsel to any Stalking Horse Bidder;<br><br>• all persons and entities known by the Debtor to have asserted any lien, claim, interest, or encumbrance in the Royalty Assets (for whom identifying information and addresses are available to the Debtor);<br><br>• all relevant non-debtor parties (each, a "**Counterparty**") to any Contract that may be assumed or rejected in connection with the sale transaction;<br><br>• all of the Debtor's known creditors (for whom identifying information and addresses are available to the Debtor);<br><br>• any governmental authority known to have a claim against the Debtor in this Chapter 11 Case;<br><br>• the office of the U.S. Trustee;<br><br>• all applicable federal, state, and local taxing authorities, including the Internal Revenue Service;<br><br>• the United States Attorney's Office for the District of Delaware;<br><br>• the United States Attorney General's Office for the District of Delaware; the Office of the Attorney General and the Secretary of State in each state in which the Debtor operates;<br><br>• the Antitrust Division of the United States Department of Justice; |

| | |
|---|---|
| | • the Federal Trade Commission;<br><br>• all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and<br><br>• all other parties as directed by the Court. |
| **Sale Objections** | Objections to the sale of the Royalty Assets, including (i) any objection to a sale of the Royalty Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must (A) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) be filed with the Court by no later than December 30, 2025, at 4:00 p.m. (ET) (the "**Sale Objection Deadline**"); and (C) served on the following parties (collectively, the "**Objection Notice Parties**"): (i) the Debtor, 200 State Street, 9th Floor, Boston, MA 02109, Attn: Harrison West (email: ags@fticonsulting.com); (ii) counsel to the Debtor: Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Michael J. Merchant (merchant@rlf.com) and Amanda R. Steele (steele@rlf.com)); and (iii) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn: Timothy J. Fox (email: timothy.fox@usdoj.gov) and Jon Lipshie (email: jon.lipshie@usdoj.gov)); and (iv) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Case: (a) Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018 (Attn: James Lathrop (email: jlathrop@goodwinlaw.com) and Artem Skorostensky (email: askorostensky@goodwinlaw.com)) and (b) Robinson & Cole LLP, 666 Third Avenue, 20th Floor, New York, NY 10017 (Attn: Evan Lazerowitz (email:elazerowitz@rc.com)). |
| **Publication Notice** | Within three (3) business days after the entry of the Bidding Procedures Order, the Debtor will cause the information contained in the Sale Notice to be published once in the national edition of the *USA Today* (the "**Publication Notice**"). |
| **Qualified Bid Selections** | The Debtor will evaluate timely bids and will (i) after consultation with the Consultation Parties make a determination regarding which bids qualify as Qualified Bids and (ii) notify bidders whether they qualify as Qualified Bidders as soon as commercially reasonable following the Bid Deadline. |
| **Auction Results** | By **January 6, 2026**, the Debtor will file with the Court, serve on the Sale Notice Parties and cause to be published on the Case Website, a notice of the results of the Auction (the "**Notice of Successful Bidder**"),[5] which will (A) identify the Successful Bidder and the Backup Bidder; (B) either include a copy of each Successful Bid and the Backup Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby, or provide instructions for accessing each Successful Bid and the Backup Bid free of charge from the Case Website; and (C) set forth the Post-Auction Sale Objection Deadline and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction. |

---

[5]    In the event the Auction is cancelled, including, without limitation, because no Qualified Bids, other than a Stalking Horse Agreement, have been received as of the Bid Deadline, the Debtor shall file a Notice of Successful Bidder promptly identifying such Stalking Horse Bidder as the Successful Bidder.

| Post-Auction Objections | Following service of the Notice of Successful Bidder, Sale Notice Parties will have an opportunity to object to the conduct of the Auction and/or the particular terms of any proposed Sale Transaction in the Successful Bid (each such objection, a "**Post-Auction Objection**").  Any Post-Auction Sale Objection may be made at the Sale Hearing (the "**Post-Auction Objection Deadline**"). |
|---|---|

25.     The Debtor submits that the Sale Noticing and Objection Procedures, coupled with the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the Sale Process, including the Objection Deadlines (as defined below), the Bid Deadline and the time and location of the Auction and Sale Hearing.  Accordingly, the Debtor requests that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

### C.     Assumption and Assignment Procedures

26.     In connection with the Sale Transaction, the Debtor potentially will seek to assume and assign to the Successful Bidder one or more Contracts.  The Assumption and Assignment Procedures are designed to, among other things, govern the Debtor's provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.  The chart below sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | No later than December 8, 2025, the Debtor will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtor's good-faith calculation of Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). |

| | |
|---|---|
| **Cure Objections** | <u>Cure Objection Deadline</u>.  Any Counterparty to a Contract that wishes to object to the Debtor's proposed Cure Costs (each such objection, a "**Cure Objection**") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **December 30, 2025, at 4:00 p.m. (ET)** (the "**Cure Objection Deadline**"). |
| | <u>Resolution of Cure Objections</u>.  The Debtor, any Stalking Horse Bidder or Successful Bidder, as applicable, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtor and its estate, whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the Debtor, any Stalking Horse Bidder or, as applicable, the Successful Bidder may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction). All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under a Contract will be heard at the Sale Hearing. |
| | <u>Adjournment</u>.  If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, at the Debtor's option, be adjourned to a subsequent hearing (each such Cure Objection, an "**Adjourned Cure Objection**").  An Adjourned Cure Objection may be resolved after the closing date of the Sale Transaction.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale Transaction. |
| | <u>Failure to Timely Object</u>.   If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs. |
| **Adequate Assurance Objections** | <u>Adequate Assurance Objection Deadline</u>.  Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "<u>Adequate Assurance Objection</u>"), may raise such Adequate Assurance Objection at the Sale Hearing (the "**Adequate Assurance Objection Deadline**" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "**Objection Deadlines**"). |
| | <u>Failure to Timely Object</u>.  If a Counterparty fails to raise an Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance.  The Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document. |

| | |
|---|---|
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of the Sale Transaction, the Debtor will file with the Court, serve on the applicable Counterparties and cause to be published on the Case Website, a notice containing the list of Contracts that the Debtor assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder. |
| **Reservation of Rights** | The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Successful Bidder, shall not constitute or be deemed a determination or admission by the Debtor, the Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned.  The Debtor reserves all of its rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |

## BASIS FOR RELIEF

### I.    The Bidding Procedures Are Fair, Appropriate and in the Best Interests of the Debtor and Its Stakeholders

27.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property:  maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy estate"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Fin'l*

22

*News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

28.     The Bidding Procedures provide for an orderly and uniform process through which interested parties may submit offers to purchase the Royalty Assets.  Importantly, the Debtor believes that the timeline for the Sale Process is reasonable and will in no way hinder the Debtor's ability to sufficiently market the Royalty Assets, especially given the process Jefferies conducted during this Chapter 11 Case.  Stated simply, the Debtor, with the assistance of its advisors, has structured the Bidding Procedures to attract competitive and active bidding from parties with the financial ability to close on a Sale Transaction quickly and efficiently.

29.     Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures.  *See, e.g., In re New Rue21 Holdco, Inc.*, No. 24-10939 (BLS) [Docket No. 194] (Bankr. D. Del. May 23, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline five days after entry of bidding procedures order and sale hearing 28 days after the petition date); *In re Casa Sys., Inc.*, No. 24-10695 (KBO) [Docket No. 261] (Bankr. D. Del. May 2, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 22 days after entry of bidding procedures order and sale hearing 62 days after the petition date); *In re SC Healthcare Holding, LLC*, No. 24-10443 (TMH) [Docket No. 341] (Bankr. D. Del. May 21, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 33 days after entry of bidding procedures order and sale hearing 112 days after the petition date); *In re Sientra, Inc.*, No. 24-10245 (JTD) [Docket No. 123] (Bankr. D. Del. Mar. 25, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 20 days after entry of

bidding procedures order and sale hearing 42 days after the petition date); *In re Nanostring Techs., Inc.*, No. 24-10160 (CTG) [Docket No. 384] (Bankr. D. Del. Mar. 28, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 15 days after entry of bidding procedures order and sale hearing 75 days after the petition date).[6]

**A.  The Stalking Horse Designation Procedures Have Sound Business Purposes and Should Be Approved**

30.    As noted above, the Bidding Procedures, through the application of the Stalking Horse Designation Procedures, provide the Debtor with authority to seek entry of a Stalking Horse Order that approves certain Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement. The Debtor believes that the Bid Protections may be necessary for any Stalking Horse Bidder to enter into a Stalking Horse Agreement. In addition, the Debtor believes that the presence of a Stalking Horse Bidder will set a floor for the value of the Royalty Assets and attract other potential buyers to bid for the Royalty Assets, thereby maximizing the realizable value of the Royalty Assets for the benefit of the Debtor's estate, its creditors and all other parties in interest.

31.    Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.  Second, "if the availability of a break-up fee [was] to induce a bidder to research the value of the debtor

---

[6]    The unreported orders cited herein are voluminous and not attached to this Motion.  Copies of these orders will be made available upon request to counsel for the Debtor.

and convert [the] value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

32.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

  a. the presence of self-dealing or manipulation in negotiating the break-up fee;

  b. whether the fee hampers, rather than encourages, bidding;

  c. the reasonableness of the break-up fee relative to the purchase price;

  d. whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

  e. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

  f. the correlation of the fee to a maximum value of the debtor's estate;

  g. the support of the principal secured creditors and creditors' committees of the break-up fee;

  h. the benefits of the safeguards to the debtor's estate; and

  i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

33.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtor's estate because they may enable the Debtor to secure an adequate floor for the Royalty Assets and to therefore insist that competing bids be materially higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtor's estate.  Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Royalty Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder.  The bid of any Stalking Horse Bidder would send a message to all potential bidders that the Royalty Assets are at least worth as much as any Stalking Horse Bidder is willing to offer.  Therefore, without the benefit of the bid of a Stalking Horse Bidder (i.e., a bid providing the floor), the bids received for the Royalty Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

34.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  *In re Integrated Res., Inc.*, 147 B.R. at 659.  The Debtor does not believe that the Bid Protections will stifle bidding.  To the contrary, the Debtor believes that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders".  *Id.* at 662.

35.     Here, a Stalking Horse Bid would serve all three functions.  First, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections.  Second,

RLF1 34196803v.6

pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. Third, a Stalking Horse Bid could attract additional bidders because, among other things, additional bidders would be able to save considerable time and expense because they could use many of the documents that any Stalking Horse Bidder may negotiate, including, among other things, a Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if the Royalty Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale Transaction likely will be the result of any Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Royalty Assets and establishing a minimum acceptable price and offer against which other parties can bid.

36.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible'". *Id.* (citation omitted).

37.    Here, the Stalking Horse Designation Procedures afford the Debtor with important flexibility to seek approval of Bid Protections to the extent the Debtor believes doing so will maximize the value of the Royalty Assets. Accordingly, the Debtor submits that the Stalking Horse Designation Procedures should be approved.

**B.  Approval of a Sale of the Royalty Assets Is Warranted Under Section 363 of the Bankruptcy Code**

38.    Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely

authorize a sale if it is based upon the debtor's sound business judgment. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

39.     Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)).   As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### 1.     The Debtor Has Demonstrated a Sound Business Justification for the Sale of the Royalty Assets

40.     A sound business justification exists where the sale of a debtor's assets is necessary to preserve the value of the debtor's estate for the benefit of creditors and interest holders. *See,*

*e.g., Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

41.     As set forth above and in the O'Hara Declaration, a strong business justification exists for a sale of the Royalty Assets as described herein.  An orderly but expeditious sale of the Royalty Assets is critical to maximizing recoveries for the Debtor's economic stakeholders. Moreover, a timely closing of a sale of the Royalty Assets is necessary given the DIP Maturity Date under the Debtor's DIP Financing and the liquidity constraints.

## 2.     The Sale Noticing and Objection Procedures Are Appropriate and Comply with Bankruptcy Rules 2002 and 6004

42.     Bankruptcy Rules 2002 and 6004 require the Debtor to notify creditors of the proposed sale, provide a description of the Royalty Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale Transaction and the Objection Deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c) and 6004(a).  The Sale Noticing and Objection Procedures set forth above are reasonably calculated to provide all of the Debtor's known creditors and other parties in interest with adequate and timely notice of all of the key dates, deadlines and other material information related to the Sale Process.  Further, publishing the Publication Notice in the *USA Today* is designed to capture any creditors and parties in interest not currently known to the Debtor.  Accordingly, the Debtor requests that the Court approve the Sale Noticing and Objection Procedures as set forth herein, including the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, and find that no other or further notice of the Bidding

29

Procedures, the Auction (excluding the Auction results) or the Sale Hearing is necessary or required.

> **3.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Royalty Assets**

43.    The Debtor believes that a Sale Transaction governed by the Bidding Procedures will yield a fair and reasonable price for the Royalty Assets.  The Bidding Procedures were designed to facilitate a competitive bidding process.

44.    The Debtor also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire Sale Process.  The Bidding Procedures provide an appropriate framework for the Debtor to review, analyze and compare bids for the Royalty Assets and to engage with bidders on an arm's-length basis to work to improve the quality of its bids for the benefit of all parties in interest.

45.    A Sale Transaction governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Royalty Assets, but also the highest or best value for the Royalty Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in this Chapter 11 Case.

> **4.      The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Royalty Assets Is Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code**

46.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

30

11 U.S.C. § 363(m). Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

47.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

48.     The Debtor submits that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. In addition, Jefferies is an independent investment bank retained by the Debtor for the purpose of exploring strategic alternatives, marketing the Debtor's business and soliciting bids since February 2025. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Royalty Assets. Any purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arm's-length and in good

faith. Accordingly, the Debtor seeks a finding that any Successful Bidder (including any Stalking Horse Bidder if declared the Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

49. Based on the foregoing, the Debtor submits that it has demonstrated that the proposed Sale Transaction is a sound exercise of the Debtor's business judgment and should be approved as a good faith transaction.

### C. A Sale of the Royalty Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code

50. In the interest of attracting the best offers, the Court should authorize the Debtor to sell the Royalty Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

(a) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b) such entity consents;

(c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d) such interest is in bona fide dispute; or

(e) such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

32

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132,

1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same);

*In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

51.     The Debtor anticipates that any Sale Transaction it elects to pursue will satisfy one

or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and

clear" sale of the Royalty Assets.  As an initial matter, the DIP Lender, who is secured by liens on,

among other things, the Royalty Assets, already consented to the terms of the Bidding Procedures,

and subject to the Bidding Procedures, will be actively involved in the Sale Process.  Additionally,

any parties with junior liens on the Royalty Assets can be compelled to accept a money satisfaction

of their interests, but also would be adequately protected by such liens attaching to the proceeds

of the applicable Sale Transaction in the order of their respective priority.  Accordingly, the Debtor

requests that the Court authorize the sale of the Royalty Assets free and clear of any liens, claims,

interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy

Code.

**D.  The Debtor's Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

52.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C.

§ 365(a).  Courts employ the business judgment standard in determining whether to approve a

debtor's decision to assume or reject an executory contract or an unexpired lease.  *See, e.g., In re*

*Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of

a lease "will be a matter of business judgment . . . .");  *In re HQ Global Holdings, Inc.*, 290 B.R.

507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract

is governed by business judgment standard and can only be overturned if decision was product of

bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

53.     Any proposed Sale Transaction will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment.  Assumption of any Contracts is an exercise of the Debtor's sound business judgment because the transfer of Contracts in connection with a Sale Transaction is an essential element in the Debtor's ability to maximize the value of the Royalty Assets—and, particularly so when a Contract is integral to the ownership or operation of the Royalty Assets to be acquired.

54.     The consummation of any Sale Transaction involving the assignment of a Contract will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Contracts to be assumed be cured or that the Debtor provide adequate assurance that such defaults will be promptly cured.  See 11 U.S.C. § 365(b)(1).  The Debtor's assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of an applicable Sale Transaction.  As set forth above, subject to the Court's approval, the Debtor will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtor's good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale Transaction.  Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

55.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance."  *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

56.     Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

57.     The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable

obligations under any Contracts that may be included in the bid.  The Debtor will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following its receipt of such information.  Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtor and, if necessary, lodge an Adequate Assurance Objection at the Sale Hearing.  In light of the foregoing, the Debtor's assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

58.    Finally, in order to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Royalty Assets, the Debtor further requests that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[7]

## VI.    Requests for Immediate Relief & Waiver of Stay

59.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtor seeks a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order and any other order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale Transaction.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the

---

[7]    Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

60.    For the reasons set forth herein, the relief requested herein is necessary and appropriate to maximize the value of the Royalty Assets for the benefit of the Debtor's economic stakeholders. Given the Debtor's financial condition, the Debtor's wind down efforts, and the time-intensive nature of conducting a comprehensive Sale Process, the relief requested herein should be granted and effective as soon as practicable. Any delay in the Sale Process could jeopardize the Debtor's ability to maximize value for its stakeholders. Accordingly, the Debtor submits that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## **NOTICE**

61.    Notice of this Motion will be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) the United States Department of Justice; (iv) the Internal Revenue Service; (v) counsel to the Committee; (vi) counsel to the DIP Lender; (vii) counsel to the Prepetition Secured Lender; (viii) all persons and entities known by the Debtor to have asserted any lien on or encumbrance with respect to the Royalty Assets (for whom identifying information and addresses are available to the Debtor); and (ix) any other party entitled to notice pursuant to Bankruptcy Rule 2002. The Debtor believes that no further notice is required.

62.     A copy of this Motion is available via (i) PACER, which is accessible through the Court's website at: http://www.deb.uscourts.gov, and (ii) the website maintained by the Debtor's claims and noticing agent, Epiq Corporate Restructuring, at https://dm.epiq11.com/AGS.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion and (iii) grant such other and further relief to the Debtor as the Court may deem proper.

RLF1 34196803v.6

Dated:  November 21, 2025
      Wilmington, Delaware

Respectfully Submitted,

*/s/  Amanda R. Steele*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Matthew P. Milana (No. 6681)
Clint M. Carlisle (No. 7313)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
      merchant@rlf.com
      steele@rlf.com
      milana@rlf.com
      carlisle@rlf.com
*Counsel for Debtor and Debtor in Possession*

RLF1 34196803v.6